**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON**

**UNITED STATES OF AMERICA**

**v.** **CRIMINAL NO. 2:26-cr-00097**

**DAVID ELLIOTT PRITT**

**RESPONSE OF THE UNITED STATES TO DEFENDANT'S**
**MOTION FOR PRETRIAL RELEASE**

Now comes the United States of America, by Jennifer Rada Herrald, Assistant United States Attorney for the Southern District of West Virginia, and responds to defendant David Elliott Pritt's motion for pretrial release. For the reasons stated below, defendant should remain detained pending trial.

*A. Background*

From approximately 2020 through 2026, defendant was a first a middle school social studies and then a high school English teacher in Fayette County. Beginning during the 2024-2025 school year, per the allegations of the victim in this case and statements from other individuals, defendant began to pay particularly close attention to multiple female students in the eighth grade. He also began communicating with them on online platforms not sanctioned for school use, including Roblox, Snapchat, and Instagram. Students have disclosed that defendant would sometimes touch them on the knees. Students also disclosed that defendant would often discuss personal matters with them, including telling them about problems in his marriage, personal life, and mental health.

For the 2025-2026 school year, these students moved to the local high school, and Pritt transferred and becaume their freshman English teacher. During the summer between these school years, Pritt began targeting one particular female student ("Minor 1") over Snapchat. According

to the minor, their interactions on Snapchat progressed to him engaging in sexual conversations with her, sending her photos of his nude genitals, and requesting that she take and send sexually explicit images. Once the school year started, he continued to have numerous freshman girls spend time in his classroom. He also continued to engage in inappropriate communications with Minor 1 over Snapchat. He began to suggest that they engage in a physical sexual relationship, and would send her messages on Snapchat to discuss sexual activity he wished to engage in with her. Per his requests, Minor 1 met with defendant in his classroom alone on several occasions during which defendant made her perform sex acts on him. At the time, Minor 1 was only 14 years old.

This situation continued through the first half of the 2025-2026 school year. When defendant went on leave from school to serve as a Delegate in the West Virginia Legislature in approximately January 2026, the physical encounters ended, although defendant continued to engage in inappropriate sexual conversations with Minor 1 via Snapchat. In early 2026, Minor 1 began dating another teenager. Defendant then appeared to become jealous and possessive in his conduct toward Minor 1: he would attempt to make her feel guilty for leaving him for someone else, he began to surreptitiously give her gifts at school (including a gold bracelet and a bottle of the cologne he wore), and he provided her with a type-written letter (attached hereto as Exhibit 1).

In this letter, defendant repeatedly told Minor 1 how much he loved her, calling his feelings for her "the most real love I have ever experienced" and writing, "God, there really are no words deep enough or strong enough for me to try to explain how I feel." He then followed that up with sexual innuendo by writing, "Please just give me some grace here this is probably the hardest (heh) letter I have ever or will ever have to write in my life." He explained that "being with you never felt wrong to me" and told her that "not being able to be with you will be the greatest sadness in my life." When he discussed how sad he was that he would not be able to be a part of her life in the future, he stated that "the universe is just cruel like that sometimes."

Defendant also repeatedly emphasized that he would forever have these feelings for her, writing:

- "I will ALWAYS be here for you"
- "I will always believe our souls were meant for each other, but we were just unable in this life to make it work"
- "I will love you for the rest of my life"
- "… I will always love you…I will always be in love with you." (ellipses in original)
- "You have my heart…forever. I will forever be yours. I will miss you forever." (ellipsis in original).

In summer 2026, defendant was still regularly communicating with Minor 1 on Snapchat. Also in summer 2026, Minor 1 began talking to defendant about how she felt that she needed to tell someone what had happened with him. On or about June 20, 2026, defendant sent a number of Snapchat messages to Minor 1 attempting to convince her to keep quiet about his conduct. Minor 1 took pictures to document these messages. In one message, defendant wrote:

> [T]hen the state police show up and take your phone and mine snd [sic] open up hell in our lives. And because of me it would very much not be a low key. It would be in the news. It would be awful. For both of us[.] And I would lose my entire life. Everything. And I am so sorry.

Defendant then pled with Minor 1 to stay silent, saying "I am begging you. I can't lose my kids. I would die. Please. What can I do to just make it ok? I will do anything." When Minor 1 told defendant that she felt "so disgusted" when she thought about what happened and wrote, "How could you do that it's disgusting," he responded, "Please. You can't. I feel the same way trust me and I am so sorry. I don't want to lose my whole life. Please I am begging you."

In July 2026, Minor 1 disclosed to her parents what had happened with defendant and underwent a forensic examination. Based upon that information, the United States obtained a

criminal complaint charging defendant with a violation of 18 U.S.C. § 2422(b) and a search warrant for his residence. Defendant was arrested on July 22, 2026. During the search of his residence, a typewriter was seized. A search of defendant's classroom also located several (nonsexual) notes from Minor 1 that defendant had stored in his desk.

On August 18, 2026, defendant was indicted for violations of 18 U.S.C. §§ 2422(b), 2251(a), and 1512(b)(3).

*B. 18 U.S.C. § 3142(g) Factors*

*1. Rebuttable Presumption*

The United States has invoked the rebuttable presumption of dangerousness under 18 U.S.C. § 3142(e)(3). While defendant has suggested a general plan to be released to a mental health program operated by the Department of Veterans Affairs ("VA"), that alone does not automatically rebut the presumption. This is particularly true based upon the utter lack of evidence that this VA program is equipped to handle the bond conditions required by the Adam Walsh Act and other conditions that are commonly applied to those charged with sex offenses against minors.

Specifically, neither the motion nor the VA acceptance letter confirms that defendant could be placed on electronic home incarceration. There is no evidence that the program keeps patients "locked down" on premises such that defendant would not be able to freely leave the facility; if patients are free to leave, there is little assurance that the VA program could meaningfully ensure that defendant not leave the premises.

The court has been provided with no information that the VA could ensure that minors are not present at any time in any areas of the VA facility accessible to defendant. Given that defendant committed many of the alleged crimes using his phone and social media, an appropriate (and commonly applied) condition of release would be a prohibition from defendant having any access to the Internet or any electronic devices that can connect online via the Internet or cellular

networks; it is unclear whether the VA program could ensure that such a condition could be met. A review of the campus map for the VA facility (*see* https://dsva-vagov-prod-cms-files.s3.us-gov-west-1.amazonaws.com/2023-08/Martinsburg%20VA%20Map%2009-06-2022_0.pdf, last visited October 22, 2026) shows that the building listed in the acceptance letter for the program (building 502F) is a very short distance from both the hospital's internet café and the main hospital building (building 500), which is a location where minors are likely to be regularly present as visitors or while accompanying their parents to appointments:




This close proximity would make it difficult for even electronic monitoring to ensure that defendant would have no access to either the Internet or minors.

Another common bond condition for those charged with similar sex offenses is a requirement that defendants take polygraph examinations to ensure compliance, and there is no indication that defendant would be able to comply with that monitoring while at the VA facility. Defendant is also requesting to be released to a program in another district where he has no other ties or connections, yet he has proffered no third-party custodian at the VA who will take responsibility for monitoring him and reporting any violations of the conditions of release.

The burden is on the defendant to provide assurances on these fronts to rebut the presumption of dangerousness. He has not done so in his motion and has not proffered any anticipated testimony from a VA employee. Mere acceptance to a mental health treatment program and a person to drive him to court is insufficient to rebut a presumption of dangerousness.

While all of these concerns demonstrate how the presumption of dangerousness cannot be rebutted, defendant's request is problematic for an additional reason. His request is for release for a short and indefinite period of time (45 to 60 days). Defendant provides no evidence at all regarding where he will go after this program is completed. Given that no such plan has even been mentioned, the United States assumes that defendant would return to the custody of the United States Marshals Service after the program. However, this would require a finding by the court that defendant is both not a danger (such that he could go to the VA program) and is a danger, such that he would be returned to custody following the program. There is simply no reason to release an otherwise presumptively dangerous defendant to a medical program when defendant has made no showing to rebut the presumption of dangerousness regarding any release plans for after he would complete said program.

Even if, however, the Court were to find that the presumption of dangerousness has been rebutted as to the VA program, the presumption still has an important role to play in the overall assessment of danger. Even after being rebutted, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by district court." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001); *see also United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010); *United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003). This is because Congress has designated such crimes as particularly dangerous, and courts should keep this consideration in mind when evaluating the factors under 18 U.S.C. § 3142(g).

*2. 18 U.S.C. § 3142(g)(1) – Nature of the Offense Charged*

Defendant's exploitation and enticement crimes involved the alleged grooming and victimization of his own 14-year-old student, a child he was under an obligation to protect from harm. The charged offenses are among the most serious federal offenses, and defendant's

commission of these crimes involved a significant breach of trust in addition to the sexual abuse of a child.

On top of the alleged sexual abuse of a child, defendant later sought to prevent Minor 1 from reporting him. He begged her to not ruin his life and cause him to lose his children. Over the course of their long-term interactions beginning while at the middle school, defendant had confided in Minor 1 regarding his mental health (as he stated in his letter, he was a "broken person" who had "bare[d] his soul" to Minor 1). Telling Minor 1 that he "would die" if he lost his children was likely meant to convince her that she would be responsible for him losing everything and possibly committing suicide if she told anyone about the abuse. He implored her to tell him how he could "make it okay," which was tantamount to offering a child a bribe to buy her silence regarding his crimes. That a teacher could put this kind of pressure and guilt on a 14-year-old girl in order to avoid being held responsible for his choice to engage in long-term grooming and abuse is reprehensible.

The nature and circumstances of the charged offenses weigh strongly in favor of detention.

*3. 18 U.S.C. § 3142(g)(2) – Weight of the Evidence*

The case against defendant is strong. Minor 1 provided a detailed account of sexual abuse by defendant, which has been corroborated in multiple ways, including through other witness statements, the gifts that defendant gave her that have been turned over to law enforcement, his typewritten letter to her, and items found in his home (including a typewriter). Critically, defendant's June 20, 2026, messages to the victim also provide ample corroboration directly from defendant: he knew that the "disgusting" things Minor 1 said he had done would lead to law enforcement showing up at his door, his arrest, and his losing "everything." If defendant had not engaged in the conduct Minor 1 disclosed, he would hardly have expressed such concerns or have repeatedly apologized to her for his conduct; it is highly unlikely that someone would repeatedly

say they are "so sorry" for something that they did not do. This factor thus also weighs against release.

*4. 18 U.S.C. § 3142(g)(3) – History and Characteristics of Defendant*

Defendant's history and characteristics demonstrates the danger he poses: per numerous accounts, defendant used his role as a middle school and high school teacher to groom a variety of minor females and ultimately target Minor 1. He followed Minor 1 to her high school. He used his role as the "fun teacher" to cause numerous students to think that inappropriate interactions with their teacher (both online and in person) were both normal and came with special favorable treatment at school, and after causing the students to let down their guard he manipulated one into becoming a victim of abuse at his hands. This was a fundamental and disturbing violation of his duty to protect the children entrusted to him for their educations.

In this respect, defendant has already demonstrated an abuse of a position of trust. At the time he allegedly committed his crimes, he was both a teacher and a member of the West Virginia Legislature. He was tasked with enacting laws to protect children while simultaneously committing crimes against one entrusted to his care. While not a perfect analogy, defendant's position as a lawmaker and teacher put him in a similar position as those in law enforcement tasked with protecting the public and enforcing the law. As United States District Judge Irene C. Berger noted in her denial of a motion to revoke a detention order in *United States v. Larry Clay*, "Much like a defendant who is alleged to have committed a crime while under court supervision, a defendant who is alleged to have committed a crime while entrusted with the responsibility and power of law enforcement has abused trust and demonstrated disdain for the laws he was charged with enforcing." Case No. 2:21-cr-00062, ECF No. 25 (April 19, 2021). When a legislator and teacher breaches the public trust, he has shown a contempt for the law that undermines any argument for his commitment to abiding by conditions of pretrial release.

Defendant's non-sexual conduct toward Minor 1 also raises numerous concerns. The hand-typed letter that he wrote to her demonstrates his utter obsession with her. No adult man — much less a teacher — should have such an all-consuming fixation on a 14-year-old child. Consistent with Minor 1's description of defendant attempting to make her feel guilt over allegedly leaving him for someone else, defendant's letter conveys the sense that Minor 1 will never be free from defendant's attentions, which is a particularly intimidating message to be received from a teacher at her school. Any defendant so acutely obsessed with a child should be considered a danger and detained pending trial.

While defendant's history does indicate that he has been treated for mental health conditions in the past, that alone is not enough to overcome the numerous and persuasive reasons that weigh in favor of detention. Per information provided to the United States Probation Office, defendant had been under treatment and receiving medication for two years for his mental health conditions. He denied having suicidal thoughts. His only described acute mental health episodes occurred many years ago (2017 and 2018). Notably, defendant does not make any assertions that he is being deprived of his mental health medications while detained. He also did not seek in-patient mental health treatment until he was incarcerated in this case, when it became a way for him to temporarily get out of jail. In short, there is no indication in the record that defendant is currently in need of acute in-patient treatment that he did not previously require or that he is being deprived of the mental health treatment he was receiving prior to his arrest.

*5. 18 U.S.C. § 3142(g)(4) – Danger Posed to Community*

For the reasons outlined above, defendant poses a danger to the community. The proposed release plan to a VA hospital does not contain any indication that the conditions necessary to potentially mitigate such a danger would be enforceable or that the VA is willing to take on the role of third-party custodian to ensure that all conditions of release are met. The danger posed by

defendant is significant, and no combination of conditions can assure the safety of the community from that danger.

*C. Crime Victim's Rights Act (18 U.S.C. § 3771(a)(4))*

The Crime Victim's Rights Act (18 U.S.C. § 3771) provides victims of crime with the "right to be reasonably heard at any public proceeding in the district court involving release . . ." The United States has consulted with the parents of Minor 1, who authorized the United States to convey to the Court their deep concern about defendant's release and the negative impact that release could have upon Minor 1's ability to process and recover from her abuse at defendant's hands. They strongly urge the Court to deny defendant's request for release.

*D. Conclusion*

For the above reasons, there is no combination of conditions that would adequately assure that the public would be protected from defendant, nor is there a proposed plan to ensure compliance with any necessary conditions of release. A generic release plan to a minimally-described VA program falls far short from rebutting the presumption for detention and cannot overcome the numerous factors that support detention. Accordingly, consistent with the recommendation of the United States Probation Office, defendant should remain detained. To the extent that this Court is considering granting defendant's motion, a hearing must be held where defendant produces a witness from the VA to testify regarding the facility's ability to comply with the Adam Walsh Act and other conditions of release.

Respectfully submitted,

MOORE CAPITO
United States Attorney

By:

/s/ Jennifer Rada Herrald____
Jennifer Rada Herrald
Assistant United States Attorney
WV Bar No. 12181
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone: 304-345-2200
Fax: 304-347-5104
Email: Jennifer.herrald@usdoj.gov

CERTIFICATE OF SERVICE

It is hereby certified that the foregoing "RESPONSE OF THE UNITED STATES TO DEFENDANT'S MOTION FOR PRETRIAL RELEASE" has been electronically filed and service has been made on opposing counsel by virtue of such electronic filing this 23rd day of October, 2026, to:

Wesley P. Page
Federal Public Defender
300 Virginia St. E., Rm. 3400
Charleston, WV 25301
Wesley_page@fd.org

/s/ Jennifer Rada Herrald
Jennifer Rada Herrald
Assistant United States Attorney
WV Bar No. 12181
300 Virginia Street, East
Room 4000
Charleston, WV 25301
Telephone: 304-345-2200
Fax: 304-347-5104
Email: Jennifer.herrald@usdoj.gov